Good morning Chief Judge, members of the panel, may I please the court, Daniel Tomash for appellant Roquette Frere. I would like to reserve three minutes of my time for rebuttal please. Your Honor, arbitration is based on consent, and we accept on this appeal that arbitrators have exceedingly broad discretion to resolve issues that have been submitted to them by the parties. But the power of arbitrators is constrained by two things. By the terms of the underlying agreement that contains the arbitration clause, which is here. Let's focus on that here. It's strange because you've got numerous agreements, two arbitration clauses. The one in issue apparently is in the Joint Venture Operating Agreement. That is correct. But in interpreting the Joint Venture Operating Agreement arbitration provision, the arbitrator looked to the MTA arbitration, the MTA agreement, I won't say the MTA arbitration clause, but he looked to the MTA agreement, which is part of your problem, part of your argument. Was it inadvertently omitted from the JVOV? The MTA, was that intentionally not integrated into the Joint Venture Agreement? Absolutely intentionally not incorporated. That's not what the panel found. The panel didn't make a finding that the MTA arbitration agreement was incorporated. The panel found a breach of the MTA. The panel did not find that the MTA was brought into the arbitration clause of the JVOV. No, not the arbitration clause, but that there was an omission, an inadvertent omission of the MTA and that all of those agreements were intended to be… No, the inadvertent omission was actually of the Solozheim license agreement. That became an issue because the Solozheim license agreement, which is the basis for Solozheim's claim, was not identified in the JVOA, although it's referenced and it's attached, but it wasn't actually incorporated. All right. We gave up that issue. Now, that's what they're thinking. How could you look at the JVOA without at least being cognizant of the obligations under the MTA? Because the MTA, I'm assuming, was put in place so that Solozheim could safely give to, I'll call it Roquette, the kinds of intellectual property and scientific knowledge it needed to make the operation of the joint And there's an issue about what are they going to do with it? Are they going to use it for their own purposes? Are they going to file patents on it? So you have this MTA to formally set out the rights that the receiving party here, Roquette, is getting when they get this intellectual property. It's very important to be clear, Your Honors. They're two separate agreements. They're actually between separate parties. The MTA, Solozheim is not a party to the 2010 MTA. The parties to that agreement are SRN and Roquette. The parties to the JVOA are Roquette and Solozheim. The parties, those two agreements, have different terms. They deal with different things. But that doesn't make any sense, though. I guess that's the point. The joint venture, in order for this thing to get up and operate and get the, I'll call it the intellectual property or firepower that it needs, setting aside the manufacturing and capital expertise of Roquette, there has to be some provision for Solozheim to protect its interests. Correct. And there were two provisions. In the MTA, they were actually giving material. They were giving algae. They were giving substance, organic material. That was what was going in that transfer. And in the MTA... That was transferred to SRN. SRN was transferring, SRN, which had received it from Solozheim, SRN was transferring that  Roquette. Roquette, so Roquette could start the manufacturing process work that it wanted to do. And there were limitations on how, what Roquette could do with that material and with the results of any testing of the material. That wasn't a whole transfer of patent portfolio. That was material. Then in the 2010 JVOA, both sides are contributing intellectual property and my client is contributing all the money that makes this thing happen. Those two are going together. And there are different provisions that govern... But there was a dispute about that intellectual property, right? Right, and the intellectual property is the JVOA. Right, and both sides asked for the arbitrators to adjudicate SRN's intellectual property, correct? Yes, SRN's intellectual property. Right, and part and parcel of that included evidence regarding what the parties had done in that regard, right? There was evidence of what the parties had done, yes. And what the parties had done included Roquette doing these copycat patents? No, that wasn't part of... There was a defined body of SRN intellectual property. It's set forth in the two demand letters. Then what are you saying the arbitrators did wrong? Well, the arbitrators did two different things wrong. We have two separate parts of this with respect to the disposition of the SRN assets. The arbitrators made a separate mistake with regard to the Roquette patents. Both derived from the same principle, which they went beyond what the parties agreed to have them do. But why couldn't... I think what the arbitrators did is basically assessing damages, if you will, for a breach. And why wouldn't the initial submission that's in the JVOA agreement, the submission pursuant to that arbitration agreement, why wouldn't that be broad enough to allow the arbitrators to basically fashion a remedy? In fact, I think it says that. I think it's 21C something, 21.1C, which gives them the authority to fashion a remedy for a breach. A breach of the JVOA. No, that wasn't what... The JVOA wasn't a breach issue at all. Under the JVOA, the parties worked together, they contributed assets, we contributed money. The SRN had stuff. It had intellectual property. There was no breach issue whatsoever. The issue was, the parties agreed to dissolve the JVOA, and under the JVOA, upon dissolution, assets have to be distributed. So the only issue was, everybody knew what the assets were, and now the question was, who gets them? But those assets were five patents. Can I look at the language in the JVOA for a minute? Why don't you quote for us the operative language about arbitrability in the JVOA, which I appreciate is different than the language in the MTA? Correct, Your Honor. There are two separate arbitration clauses, and it is important to note, the JVOA comes first. The JVOA is in place first, then the parties... Well, there was an 09 MTA, but then there was a later MTA. There's an 09 MTA, but it's not in this case. I mean, no party's raising an issue on the 09 MTA. It was accidentally referenced, and then corrected. The 2010 MTA comes in place a month after the JVOA. The JVOA has an arbitration clause in it that handles arbitrations between Roquette and Solozine, and then, a month later, we have the 2010 MTA and the manufacturing agreement. The manufacturing agreement contains its own separate, distinct arbitration clause, and... But let's move the MTA to the JVOA. Okay, but when the MTA comes in, it chooses to adopt the manufacturing, not the JVOA. We appreciate that. The JVOA legal dispute is at paragraph 22.3, found at A138, and it indicates that the legal disputes arising out of or connected with the interpretation or enforcement of the legal duties, rights, and obligations of this agreement. All right. Now, what's interesting to me, I took note in your opening brief, you quote that language on page 9 of your brief, but then, interestingly, later, at pages 14, 30, 33, 36, and 42, you repeat the phrase arising out of, but you omit the phrase in connection with. Is that a tacit admission that if we give effect to the phrase in connection with, that that's sufficiently broad to support what the arbitrators did here? No, that was not what the... Was that just an accidental omission, or was it strategic? It was just coincidental? It really isn't. Connected with, you may argue, broadens things. It doesn't matter. Whether it's arising out of or connected with doesn't matter. It has to be arising out of or connected with. So the words connected with don't mean anything? They're just duplicative of arising out of? No, they broaden it, but it is only what arises out of or is connected with this agreement. But if we assume that the shadow patent applications should be deemed to be improvements, doesn't that mean that the handling of those comes squarely within this clause? Well, Your Honor, what I would suggest is that was the theory that Solzheim has. They're improvements. The question is... Well, and that's the theory that the panel bought, basically. Yes, but what the panel bought... But isn't that true? If they are deemed improvements, then do we not have a situation of misery? That issue was never litigated. It was never litigated at all. You had two experts. Each side had an expert. Not about the Roquette patent applications. What the experts testified to was whose underlying technology did the SRN assets relate to. These are different patent applications. There were five families of patent applications in the SRN estate. There were 28 patent applications from Roquette that got locked into the award. There was no hearing about those. Then I'd like to question you about what did they do under the material transfer agreement that was so wrong? The panel. What the panel did was it found a breach at page 66 of the record. It said, we find that Roquette breached section 3.3... But that finding really wasn't relevant to the ultimate resolution of the case. They didn't give damages for that breach. They did that in terms of finding these shadow patent applications. They weren't properly done by Roquette. That issue wasn't litigated. They won on default. It was a failure of proof because they said, we're now going to litigate the provenance of the 28 or these dozens of patent applications for Roquette. No party demanded Roquette property be subject to arbitration at any point. There was no supplemental demand. That never happened. The only arbitration that the parties demanded was to take the existing assets of SRN and distribute them upon dissolution. When things looked like they were going well for Solozine, they tried to roll in a whole new case, which is the Roquette property. The JVOA does not allow for a dispute about Roquette property. What happens... What if it's connected with it? What if it's an improvement? Those are two ways it can be rolled in, right? It is only an improvement if certain facts are found. The fact that it has to be found relates to who did the work on those patent applications. You have to put those patent applications into the case before you can make a factual determination. So why isn't exactly this kind of argument the kind of thing that the arbitration panel would decide? This is exactly why we have arbitration. The arbitrators need to decide this and not a court. An arbitration panel can absolutely decide it, but it's a separate issue. But what it decided was we find Roquette breached, okay, but it says the so-called shadow patent applications filed by Roquette and all patents that may be subsequently issued in related know-how now are the property of Roquette, belong to Solazine, and must be assigned by Roquette to Solazine. Isn't that tantamount to saying they're improvements? No. It's tantamount to saying you've breached Section 3.3, which restricts what you can do with the starting material. And based on... And that provision, 3.3, has in it a specific assignment provision that allows an assignment from Roquette back to SRN. There is no provision in the JVOA that would provide for an assignment of Roquette property. That can't happen. There needed to be an arbitration. If they wanted to arbitrate whether the Roquette patent applications were actually SRN, that is a separate arbitration. They could have done that under the material transfer agreement. That would have... They would have had to have a demand about that. There would have been discovery about that. There would have been hearing and evidence about that. Those are separate obligations in a separate document. But why wouldn't those obligations nevertheless be connected to... Well, if that had led to a result, if that had led to the result that those properties, the Roquette property, was now deemed to be SRN property, then it would have been totally appropriate to say, okay, now it goes over to Solazine if we find that it's an improvement, as Judge Rendell said. Indeed, this panel could have said, this panel could have said, we are determining that all property of SRN belongs to Solazine. I believe they would have been wrong to do it, but they could have done that. But the problem here was that they identified property of Roquette, and they said Roquette property was owed to Solazine. They have to have the property be SRN property. And we never had demand for any resolution of any issue about the Roquette patent applications.  You are now trying to arbitrate a case involving the Roquette applications. No one demanded that. It's not allowed under the JVOA, and the JVOA is the only source of your authority. So Roquette walked away. They stopped participating in that space. This is not a situation, I view this almost as an appropriation. The arbitration panel determined that what you're defining as Roquette property came to be Roquette property. Because of the Solazine property, Roquette property. Yes, they did that based on an allegation and the absence of proof, because we said, no, you're now in an area the JVOA doesn't give you authority. Consent is the key to arbitration. We never consented to arbitrate that issue in a JVOA arbitration. We did consent to arbitrate with SRN, not Solazine. Different parties, different requirements, different arbitration clauses. Why is the 2010 MTA denigrated in all this? That was the last agreement, and the parties agreed that you needed to demand arbitration under that. It had to be demanded by SRN. It would be a different arbitration with different arbitrators in a different city. That needed to occur. If that had occurred, if they had asked for that arbitration, they could have held an abeyance, the first one. If they had determined that those Roquette applications belonged to SRN, then it would have been fair game to say, in dissolving SRN, where do they go? They tried to short circuit the whole thing. We never got notice. We were never in a situation in which there was actual evidence on the 28 patents. Solazine acknowledges that many of those patents had nothing to do with the joint venture. But what happened is, when we left the game, then the parties said, well, give us a list of the Roquette patent applications that you allege you should get. They gave a whole list. They said, well, there may be more. And finally, the court said, well, Roquette's not here, so we're going to order everything that Roquette did in the field based on a filing date. You could file a patent based on earlier research, research that was done before the JV. So you're saying some of those aren't nearer patents? Oh, absolutely not nearer patents. All right, but then it was okay for the arbitrators to render an award on the nearer patents, but they shouldn't have done it with the unrelated patents. No. Is that your argument? No. These arbitrators, patent is personal property. It was a patent application. We got the application because we applied for the patent. There are all sorts of ways in which if you improperly apply for a patent, if you apply for a patent based on someone else's work, those patents will be invalidated. If you try to enforce them, you may be subject to penalties. Patent laws are very clear. We don't get the rights just because we apply, but it was our property. Under the patent code, it's our property when we make and file a patent application. Those are Roquette property. Roquette property isn't within the JVOA. They could have sought that Roquette property. Even if it's connected with the SRN and the JVOA? Absolutely. It is not. It is not. Did you make a demand for arbitration under the material transfer agreement? No. No one made a demand under that. That's the whole key here. You didn't either. There was no need for us to make a demand under that. There was obviously a dispute. No, there was no dispute. You're saying that they shouldn't have come to an agreement. The dispute arose primarily in the post-trial briefing. There was one reference two weeks before the arbitration was to be held in a submission by Solozay to two patents that they had issues about. Then, after the hearing was over, suddenly this became an issue and Solozay tried to roll this out. Okay, and you're objecting to them rolling it in if it was a separate dispute. Why did you not then demand the different arbitration under the agreement that you now say they should have? Because we weren't an agreed party. They were our patent applications. We wouldn't demand an arbitration to maintain our personal property. Well, they were dealing with it and doing something that you didn't want done under that material transfer agreement. No, Lee. No one was doing anything under the material transfer agreement that shouldn't have been done. All right. I'm confused. Why did you walk away from the arbitration? It seems like you're looking against yourself here. Nothing was wrong. Everything was going fine. But you pulled the rip cord and walked away from the arbitration. Because the arbitration fundamentally changed. It became a new arbitration without a demand for arbitration. Which is why I think Judge Wendell said that you pursue all your rights in relief under the MTA with that separate arbitration with a separate party. Arbitrations are demanded. It's like a plaintiff in a lawsuit by the agreed party. And you're not an agreed party. We were not an agreed party. Why are we here? We're here because you're feeling very aggrieved. We're an agreed party now because we became an agreed party the day that the panel ordered that the entire patent portfolio that we own, without any examination of 26 of the 8 patents, all of them have to suddenly be transferred over to Solazine. Not a single document in the case provides for a transfer of those. And that's the first time you were aggrieved? We were aggrieved. I thought you were aggrieved when you said this is a sham walking away. We were. And when we walked away, we went to the district court in Delaware. And we filed two separate actions asking the district court to stop the proceeding. That we were aggrieved. You're correct procedurally. But we procedurally actually went to Judge Robinson's court and we asked him two separate complaints to stop what was going on, to order that the arbitrators didn't have that authority. Nothing happened. She didn't render such an order. And then the arbitrators came down with their order and that sort of overtook that. So procedurally, we did try to do what we got. We got it from you again. Am I over here? Yes. Is it Dury or Durey? Durey? I'm getting off of this almost. I get the feeling we're spinning our wheels and it might be more possible. Following up our discussion, we do actually hear from Ms. Durey. Thank you, Your Honors. And may it please the court, Daryl and Durey appearing for Solazine. I'd like to begin with the first question that was posed by the Chief Judge. At page 25 of the arbitration award, the panel found that the agreement between the parties consists of all six of the agreements cited above that were entered into between the parties, including the JVOA, the Solazine license agreement, and the material transfer agreement. That finding was in part predicated on the fact that the material transfer agreement, which is at page 284 in the joint appendix, incorporates the entire agreement provision of the JVOA section 8. But the integration clause, I guess it's a merger clause, the language you use, of the JVOA, does not specifically reference the MTA, the 2010 MTA. That is correct. It does not. The MTA had not yet been executed. But when the MTA was executed, it then recited that it was being executed pursuant to this series of interlocking agreements that the parties had already signed, and it referenced the entire agreement provision of all of those interlocking agreements. So the MTA, the 2010 MTA, references the JVOA, but the JVOA, and I know the MTA hadn't yet been executed, but it certainly could have had language in there in anticipation because everybody knew it was going to be executed. There could have been language in the JVOA to merge into the JVOA any subsequent MTA. That would have been pretty easy to do. It could have done so. The panel nevertheless found, as a matter of fact, based in part on, I would submit, the fact that the MTA does incorporate that earlier entire agreement provision, that the agreement of the parties was all six of these agreements. In the different parties. That is correct. The MTA is formally between SRN and ROCAT. All the Solozine and Solozine's interest in the subject matter of the MTA is recited in the MTA itself. So is it your argument that that is erroneous? That was an error by the arbitration panel, but it's not irrational. It just doesn't rise to the level, that very high standard that's required for us to invalidate an arbitration. Absolutely. Absolutely not. The statement by the panel was completely correct, that the entire agreement of the parties is all six of these. That's not based on the text of the document for the reasons the Chief Judge just articulated. It has to be because of, what, intent of the parties due to ambiguity? I think the panel's finding could be supported by the fact that the MTA incorporates the entire agreement provision. Where's the incorporation clause? It is, the MTA is found at 284. What was the incorporation that you're referring to? I understand. At the very end, in paragraph 8, it says, Section 8 of the manufacturing agreement is incorporated herein by reference in its entirety. And, oh, actually, I apologize. That's not, you're right, that's not correct, Your Honor. It's the second whereas clause. I'm sorry, what page in the record are you? It is page 284 of the record. It recites that the company is a party to these various agreements referencing the manufacturing agreement, the license agreement, the services agreement, and then it says the company And then it says whereas for the purpose of carrying out. There's no incorporation. The terms of the, and subject to the terms and conditions set forth in this agreement, the JVOA, the manufacturing agreement, and the services agreement. But there is no incorporation. That's correct. It's not an explicit incorporation, but it references the JVOA. What about the fact that the arbitration should have occurred under the provisions of the MTA instead of under the other agreement? Absolutely not. This was correctly an arbitration under the JVOA because it was about the right to improvements that were made by the joint venture to Solizine's intellectual property. Except the panel itself says we are taking property of Roquette and giving it to Solizine. And your opponent says they can't really do that. They can only do that with respect to SRN property. What the panel says in the award is that Solizine has satisfied its burden of proof on its cause of action seeking a declaration that Solizine is entitled to be assigned all of the improvements SRN made to Solizine's intellectual property. And then it recites three categories of such improvements, the last of which is all Roquette patent applications filed on or after November 3, 2010. But how can the panel by wave of a wand say an SRN property, I mean Roquette property is SRN property? It is not, Your Honor, by wave of a wand. And turning to page 30 of the award in the conclusion, the panel made a factual finding that Roquette is presently attempting to patent intellectual property in its own name and marketing products that are based upon intellectual property and products that Solizine contributed to the joint venture. Right, but it says on page 66, which is 31 of the award, and the related know-how, the patents and the related know-how, now the property of Roquette belong to Solizine and must be assigned by Roquette to Solizine. Is that outside the authority of this panel to do? It is not. Indeed, Your Honor, the JVOA itself requires that intellectual property R&D work undertaken by Solizine and Roquette on behalf of the joint venture be owned by the joint venture. That is paragraph 10.2. He's arguing, and you can correct me if I'm wrong, please do a rebuttal. There's a basket of stuff that was taken from Roquette. In that basket, some of it may well be things that, under the finding here, were improvements on or enhancements of things contributed to the SRN by Solizine, but there were other things that were in that basket that were purely the property of Roquette and there was no separation of that which was Roquette's property from that which, arguably, under the arbitration's authority and his findings, may well have been improvements to Solizine property improved on by Roquette and, therefore, arguably could go back to SRN. It is correct, Your Honor, that we do not know what is in the basket, and that is because, although we raised this issue in our pre-hearing brief, Roquette failed to produce these patent applications in discovery. The panel found that they should have been produced in discovery and were not. There was testimony at the arbitration about this issue. There was testimony Roquette tried to put in evidence that it had told Solizine that it was going to be filing these separate patent applications. The panel found that not to be credible and that Solizine had not been informed of the filing of these shadow patent applications. So this issue was litigated. It is correct that the specifics of the patents were not litigated because they had not been produced in discovery, which is why in our pre-hearing brief, right after we first learned about the existence of the first of these shadow patent applications, we raised the issue with the panel and then continued to raise the issue with the panel as we learned about the existence of more. Does that mean that if they hadn't left the arbitration that perhaps some of the 28 patents would have remained property of Roquette because you would have been able to separate out the mirror patents from ones that had nothing to do with this transaction? I would say had Roquette satisfied its discovery obligations and produced in discovery the patent applications that were copied from the work of the joint venture and had it not then withdrawn from the arbitration, and I would note it withdrew in the first instance based on a complaint about the timing of the award that it is now abandoned. That was the basis for the first. It was too late, right. And Roquette is no longer advancing that argument. Perhaps it would have been the case that we would have learned that there are patents in that basket that are not based on joint venture work. We don't know. To this day, Roquette has not proffered any evidence that there are any patents in this basket that are not directly copied from work of the joint venture. Could they have done that? Should they have sought reconsideration from the panel or something on those? I would say Yeah, we shouldn't have withdrawn, but hey, by the way, out of these 28 patents, 10 of them have nothing to do with the joint venture. That certainly would have been an option available to them. They could have complied with the discovery obligation in the first instance, and this was not a surprise because the panel asked for a list of the joint venture patent applications. We said we cannot provide you with a list because they haven't been produced to us. Roquette had an opportunity to provide to the panel that list, and it refused to do so. We provided to the panel our best articulation of the contours of the joint venture work to form a basis for the award. Roquette did not object to that to the panel. Under a case law, we can infer from the conduct of the parties that the scope of the arbitration has been somewhat enlarged to permit the arbitrators to deal with something that may not be originally deemed or initially deemed to be part of the arbitration. What conduct of Roquette Frere would you cite from which we could infer the ability on the part of the panel to address these shadow patent applications and basically take them away? First, I would say the original arbitration demands were not limited to the five specific SRN patent families that we knew about. It broadly was directed to the intellectual property assets of SRN itself. So we believe that this was fairly encompassed within the original demand. When these issues were raised, as I indicated, we raised the issue in our pre-hearing brief, and there was then testimony at the arbitration about this. So Roquette had the opportunity to raise concerns with the panel. It did ultimately at the end, sort of towards the end of the process. But it never did demand arbitration under the MTA. That is absolutely correct. The other thing I would observe... But why is that? Because I was just thinking that. Because if, as you mentioned earlier, the integration occurs in the MTA, not in the JVOA, and that would have to be anticipatory, but it could have been done. But yet the arbitration request occurs under the JVOA and reaches out to another agreement which does not have the integration clause in it. It doesn't need to reach that other agreement. And let me be clear. Our demand was always and is still a demand under the JVOA for the intellectual property of the joint venture. The JVOA itself provides that the joint venture owns intellectual property based on work done on behalf of the joint venture. That's on page 2. It's JA107, page 2 of the JVOA. Also, the services agreement, which has the same arbitration provision as the JVOA, also provides that the JV owns the intellectual property of the work that is being done on its behalf. So to the extent you would construe the shadow patent applications as improvements, as I asked Mr. Tomasz, that basically brings them in? They are improvements. The panel found that they are improvements in its award. And because they are improvements to the sole design patent applications, that's why we get them. They are work that was done on behalf of the joint venture by a combination of the joint venture sole design and ROCET personnel. That is why it is intellectual property of SRN. And the panel found that this was joint venture work, joint venture patent applications, that ROCET at the time acknowledged that under the JVOA, that was the language from Bruno Quinan, and their intellectual property attorney cited in the opinion that under the JVOA, the JV owned these patent applications and had to file them. But Mrs. Tomasz is saying this stuff, and this goes back to our earlier discussion, there are some things which SRN ended up with, and sole design ended up with, that have absolutely nothing to do with sole design's efforts. We don't know that. There is absolutely no evidence that there is any patent, ROCET patent application, that falls within the bucket of rights that was assigned to sole design that does not reflect joint venture intellectual property. We don't know. ROCET has put in, because ROCET has He's telling us that now, but you're saying there's nothing in the record to support it. There's nothing in the record to support that. And again, this goes back to the fact that this is, to the extent it's an injury, and there's no evidence that it is, it's entirely self-inflicted, because ROCET refused to provide discovery in the arbitration as it was ordered to do. It's not independently discoverable? No, because their patent applications, they only become, we only learn about them as they publish. So we learned about the first one very shortly before filing our pre-hearing brief when it published pursuant to European patent procedures. And that was after the dissolution. Correct. It was after the dissolution. It was after the initial arbitration demands, shortly before the pre-hearing briefs, and we raised in the pre-hearing brief the fact that we had learned of the existence of this patent application, that it appeared to be a copy of a joint venture patent application, and that we were going to be seeking that, and to the extent it had any brethren, its brethren as well, as part of the arbitration process. And I want to note as well that in our post-hearing briefing, when we introduced the subject of these shadow patent applications, we explicitly said that we were requesting them under the terms of the JVOA, because they constitute their work that was done on behalf of the joint venture, which the panel found as a matter of fact, and because. . . Well, wait a minute. Wouldn't that then give Mr. . . . If you said that you were requesting them under the JVOA, and Mr. Tomasch's position is that these are not things under the JVOA at all, under the MTA, which shadow application clause was not triggered, would not that then. . . wait, is that a sentence? Would that not then allow them to not comply with your request? Absolutely not, because the panel correctly found that we were entitled to them under the JVOA, that the JVOA provides that work done belongs to the joint venture. The services agreement provides the same thing. The MTA only came into the picture when, in response to our point that we, that this was joint venture intellectual property under the JVOA, Roquette took the position that, oh, no, no, it had been doing this work on the side, and we said that you can't possibly have been doing this work outside the scope of the joint venture, because that would have constituted a breach of the MTA. You would have had no basis to have access to joint venture material. But the MTA came up in that context. Our claim was always that this is joint venture intellectual property under the JVOA and under the services agreement, and that it's joint venture intellectual property. It's subject to the terms of the joint venture agreement. It is an improvement to sole design intellectual property, and therefore we get it under the terms of the JVOA. That requires us to agree with the panel's interpretation of that word alone, right? I find that phrase very cryptic. So it is alone or with a third party, and the panel found that the work that was being done, again, as a matter of fact, the work that was being done by the joint venture was largely being done and anticipated to be done by sole design and Roquette personnel working together on behalf of the joint venture, and that the intent of the phrase alone or with a third party, that that entire phrase was intended to be comprehensive, such that whether the joint venture was doing the work itself or with some other party, the joint venture would own the intellectual property. Roquette's position at the arbitration was that if sole design contributed to the work of the joint venture, then it was not an improvement to sole design's intellectual property. If the joint venture had done the work independently without sole design's help, then sole design would be the beneficiary of the IP. So that's absurd, right. It is absurd, and sole design's, to the extent that the clause is ambiguous, Roquette's witnesses, the Roquette individual who participated in the negotiation of the agreement, agreed with our interpretation that testimony is cited. Party can mean either sole design or Roquette or SRN, correct? There are. Capital P party? Not to each of the individual license agreements. So if it's the sole design license agreement, we're talking about the parties to the sole design license agreement. Sole design and SRN. SRN, correct. And it's defined, party capital P. That is correct. And under the Roquette license agreement, it's Roquette and SRN capital P. That is correct. But you're saying the contrast is between party or with third party. Correct. That's right, on its own or with a third party. And what the panel correctly found is that this is all work that was being done on behalf of the joint venture, that the nominal employment status of the individuals doing the work wasn't the issue. It was all joint venture work. That was the point. And then you get into, I guess, as much media ambiguity if it's there, would not be on the same side in our administration award. Correct. Correct. It would not. It would not. There's no dispute that this fell within the scope of the panel's jurisdiction. They construed the language in the contract and found that language was, as I have just said, it was intended to be comprehensive and that as a matter of fact, this is all work that was being done by the joint venture. Okay. Thank you. Mr. Tomash. Thank you. Is it Tomash or Tomash? I'm sorry. It's Tomash, as if it were two names. It goes either way. They're both wrong. Your Honor, my name is mispronounced almost every time. Okay. At least I'm consistent. Judge Rendell, you asked about a specific incorporation clause. The MTA has a specific incorporation clause. You just saw it. It's paragraph 8. It incorporates the manufacturing agreement. It didn't incorporate the JVOA. The manufacturing agreement has a separate and distinct arbitration clause in it. That clause is the clause to invoke if you have a dispute under the MTA. There is no doubt. I heard Ms. Dury say – Oh, wait, wait, wait. So the MTA – yeah, I was looking for the – does not have an arbitration provision within itself. Within the – not within itself, but it specifically incorporates paragraph 8 of the manufacturing agreement, which has an arbitration clause which is entirely distinct. Different parties, different issues, different way to select arbitrators, different city of arbitration. All right. So then when there's all this discovery and wanting your patent applications, why did you not then ask for an arbitration under the MTA because they were going to start dealing with your patent applications, which you said they didn't have a right to do? That occurred after the hearing on the SRN assets were over and we went to district court. No one had demanded. We don't have to demand arbitration about our own property. Well, if somebody claims that it isn't your property, I would think, and you say it's under a different agreement with a different arbitration provision, it seems to me you would invoke it. No. This is a matter of prudence. I mean, to use kind of maybe a crass analogy, I mean, you felt like you were getting homered. You were getting creamed and you said, you know, the game is rigged and we don't like the refs and we're leaving, so why didn't you play a home game and invoke arbitration under the MTA? We invoked the power of the district court. That's what we did. All right. That makes sense. But we went to the district court and said stop this. They don't have the authority. All right. I have to point out, Your Honor, that at A520, if you look at Solozheim's post-trial brief, and I direct you to A520, you will see the blueprint for the decision. Not surprising. Once one party leaves, the other party tends to do real well. So, Solozheim wrote essentially the opinion itself. What did Solozheim say, I quote for you, quote, Solozheim also seeks assignment of all ROCAT patent applications that are based upon the joint venture's intellectual property assets and material pursuant to the terms of the material transfer agreement. There was no doubt about what they were asking for and why they were asking for it. Pursuant to the terms of it. Well, it depends on what pursuant modifies. I think it's a very clear sentence, Your Honor. I think if you read it and see it, you'll recognize they were asking for assignment pursuant to the terms. Now, if there's a doubt, go to the material transfer agreement. The material transfer agreement has a limitation. It says ROCAT can do patent applications in certain areas. ROCAT cannot do patent applications in other areas. It says if ROCAT files a patent application that it's not entitled to, then the ROCAT can be made to assign the patent application back pursuant to paragraph 3.3 of the MTA. Then why did you not produce all these patent applications to prove that they had no right to do what they were doing? We had conducted an arbitration about the SRN assets. That was what the arbitration, you have to demand arbitration. But then you have to show these are not SRN assets, and you weren't willing to do that, were you? No, we didn't. Both parties knew what the assets were. Look at the two demand letters. There are two demand letters in the record in Volume 2 of the appendix. We both made a demand. There's no reference to the MTA. There's no reference to the starting material that was given to ROCAT. These are totally different. I don't think you should. If this is true, taking what you're saying is true, it's a good point that the request was made pursuant to the paragraph 8 of the MTA, not the JVOA. But then once you realize that was where this thing was going, there's a discovery request where it's very easy. I understand you're saying you don't want to revoke arbitration under the MTA and go to San Francisco to prove your property is your property, but you're not in San Francisco. You're in New York under the JVOA, and there's a discovery request made so that they can arguably see what it is that you claim you have that is not related to the SRA, and then somebody gives them those applications. The first arbitration, the only arbitration that was had, was pursuant to the JVOA, and it was not about what property does the JVOA have. It was about who gets the JVOA property. It's a totally different proceeding to say, now let's talk about whose property this is. They should have, at a minimum, put in a supplemental demand for arbitration. They had a claim. It's clearly connected with, though. Even if the initial question is who gets the joint venture property, it's not a far leap to say, okay, well now we need to define what that property is. It's clearly connected to, it's even arising out of the dispute. It's an enormous leap. One would have expected a several month long arbitration going through each one of those applications one by one and looking at whether or not that application was proper under the MTA or not proper under the MTA. Their allegation about the Roket patent applications is that they were due under the assignment clause 3.3 of the MTA. That's what their allegation is. That's what the panel found. The panel has a one sentence handling of this issue. That was after you withdrew. It's after we withdrew. That's why it wasn't a knock down, drag out fight. What are they going to do, fight with themselves? You're certainly right about that. I understand. If the MTA had been being arbitrated, then walking out would have been at our own risk and we would have lost. This wasn't an MTA arbitration. No one claims it was. Look at how much is agreed upon here. Everyone agrees that the panel found a breach of the MTA, paragraph 3.3. Everyone agrees that a breach under that is remediable under the MTA by the assignment that was made. Judge Robinson found that the panel exceeded its authority in finding the breach. They did not appeal that issue. It is an undisputed issue. There's a matter of law. Judge Robinson found, and no one has attacked, the panel exceeded its authority by finding a breach. She then said, I can't be sure. You might disagree with that. There would be no reason in the record to disagree with that because what we know is that Solazine, in its post-trial brief, asked for an assignment pursuant to the MTA. The MTA allows that assignment. And the panel says at page 66, in one sentence, we find a breach and order the assignment. There is no reasonable read that says that those 28 patents went to Solazine for any reason other than a breach of the MTA. The MTA is not some sort of stray agreement. It is a separate, self-standing agreement that has its own arbitration clause, and neither party demanded it. It isn't just that we didn't demand it. No one demanded it. The arbitrators decided something beyond their power. There is nothing more fundamental than arbitrators cannot exceed their power. I would like to request transcripts. And if you can check with the acquirer, she can inform you as to exactly how to go about getting that, and you can split the costs of it. But I would like to get transcripts of the argument. Thank you. Thank you. Thank both counsels. Actually, it is an interesting argument. Not only is it an argument, this is an investment. This is an interesting argument. I will take the matter under advisement.